UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION

| | | |
|---|---|---|
| **VALERIE NICOLE POUNCY** | * | **CIVIL ACTION NO. 17-0499** |
| **VERSUS** | * | **JUDGE ELIZABETH E. FOOTE** |
| **NANCY A. BERRYHILL, ACTING COMMISSIONER, SOCIAL SECURITY ADMINISTRATION** | * | **MAG. JUDGE KAREN L. HAYES** |

## REPORT & RECOMMENDATION

Before the court is plaintiff's petition for review of the Commissioner's denial of social security disability benefits. The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the reasons assigned below, it is recommended that the decision of the Commissioner be **REVERSED and REMANDED for further proceedings.**

### Background & Procedural History

Valerie Nicole Pouncy filed the instant applications for Title II Disability Insurance Benefits and Title XVI Supplemental Security Income payments on April 25 and June 12, 2014, respectively. (Tr. 15, 203-217).[1] She alleged disability as of November 1, 2013, because of vertigo and degenerative disc disease. (Tr. 228, 232). The state agency denied the claims at the initial stage of the administrative process. (Tr. 114-141). Thereafter, Pouncy requested and received an April 28, 2015, hearing before an Administrative Law Judge ("ALJ"). (Tr. 39-113). However, in a January 20, 2016, written decision, the ALJ determined that Pouncy was not

---

[1] Pouncy filed a prior application on August 18, 1999, which was denied initially and apparently not further appealed. (Tr. 228).

disabled under the Social Security Act, finding at step five of the sequential evaluation process that she was able to make an adjustment to work that exists in substantial numbers in the national economy. (Tr. 12-25). Pouncy sought review of the adverse decision before the Appeals Council. On February 10, 2017, however, the Appeals Council denied the request for review; thus the ALJ's decision became the final decision of the Commissioner. (Tr. 1-3).

On April 6, 2017, Pouncy filed the instant complaint for judicial review of the Commissioner's decision. She asserts the following errors:

1) For various reasons, the ALJ's residual functional capacity assessment is not supported by substantial evidence; and

2) The ALJ's step five determination is flawed because he relied upon an incomplete hypothetical to the vocational expert.

The matter is fully briefed and ripe.

## **Standard of Review**

This court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards. *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying improper legal standards. *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. at 401. Substantial evidence lies somewhere between a scintilla and a preponderance. *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991). A finding of no substantial evidence is proper when no credible medical findings or evidence support the ALJ's

determination. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, (5th Cir. 1994).

## **Determination of Disability**

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability. *See* 42 U.S.C. § 423(a)(1)(D). The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work. *See* 42 U.S.C. § 423(d)(2)(A). Furthermore, a disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA. *See* 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows,

(1)   An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2)   An individual who does not have a "severe impairment" of the requisite duration will not be found disabled.

(3)   An individual whose impairment(s) meets or equals a listed impairment in

>    [20 C.F.R. pt. 404, subpt. P, app. 1] will be considered disabled without the consideration of vocational factors.
>
> (4) If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.
>
> (5) If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.

*See Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001); 20 C.F.R. § 404.1520.

The claimant bears the burden of proving a disability under the first four steps of the analysis; under the fifth step, however, the Commissioner must show that the claimant is capable of performing work in the national economy and is therefore not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987). When a finding of "disabled" or "not disabled" may be made at any step, the process is terminated. *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). If at any point during the five-step review the claimant is found to be disabled or not disabled, that finding is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## ALJ's Findings

### I.   Steps One, Two, and Three

The ALJ determined at step one of the sequential evaluation process that the claimant had not engaged in substantial gainful activity during the relevant period. (Tr. 17). At step two, he found that the claimant suffers severe impairments of diabetes, degenerative disc disease, depression, and anxiety. (Tr. 17-18).[2] He concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart

---

[2] He further found that the claimant's medically determinable impairments of vertigo, hyperlipidemia, and hypertension were not severe. *Id.*

P, Regulations No. 4, at step three of the process. (Tr. 18-19).

## II.     Residual Functional Capacity

The ALJ next determined that the claimant retained the residual functional capacity ("RFC") to perform sedentary work,[3] with occasional climbing ramps/stairs, balancing, kneeling; no climbing ladders and scaffolds, stooping, crouching, or crawling; no exposure to unprotected heights, moving mechanical parts, operating motor vehicles, or working around open bodies of water. She was further limited to simple, routine tasks, and with regard to the use of judgment and dealing with changes in the work setting she was limited to simple work-related decisions, with no jobs exceeding an SVP level of 2. She also requires a sit/stand option at will to make postural changes to adjust to symptoms. Finally, she requires a hand-held assistive device such as a cane or rolling walker for prolonged ambulation, traversing uneven terrain, and ascending/descending steps. (Tr. 19- 23).

## III.    Steps Four and Five

At step four, the ALJ employed a vocational expert ("VE") to find that the claimant was unable to perform her past relevant work. (Tr. 23-24, 106-107). Accordingly, he proceeded to step five. At this step, the ALJ determined that the claimant was a younger individual, with a limited education, and the ability to communicate in English. (Tr. 23-24). Transferability of skills was not material to the decision. *Id*.

---

[3]     Sedentary work entails:
> . . . lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. 404.1567(a).

The ALJ then observed that, given the claimant's vocational factors, and if she had an RFC that did not include any non-exertional limitations, the Medical-Vocational Guidelines would direct a finding of not disabled. 20 C.F.R. § 404.1569; Rules 201.25, Table 1, Appendix 2, Subpart P, Regulations No. 4. (Tr. 24-25). However, because the claimant's RFC included non-exertional limitations, the ALJ consulted the VE to determine whether, and to what extent the additional limitations eroded the occupational base for sedentary work. *Id*. In response, the VE identified the representative jobs of document preparer, *Dictionary of Occupational Titles* ("DOT") Code # 249.587-018; call out operator, DOT Code # 237.367-014; and food and beverage order clerk, DOT Code # 209.687-014, that were consistent with the ALJ's RFC and the claimant's vocational profile. (Tr. 24, 106-109).[4]

## Analysis

**I.   Residual Functional Capacity**

a)   <u>Non-Exhaustive Chronology of Relevant Medical Evidence</u>

On March 13, 2012, Pouncy saw Patrick McGauly, M.D., with complaints of dizziness with "black outs" for the past month that had caused her to fall and injure her back three times. (Tr. 289-291). Pouncy had received a diagnosis of vertigo one year earlier. *Id*. Since February, she had fallen a few times, each time hurting her back more. *Id*. Her back pain was in her lumbar spine and radiated to her legs and feet. *Id*. She rated her pain as a seven on a ten point scale (7/10) and constant. *Id*. Her symptoms were aggravated by bending, twisting, and other

---

[4] The VE testified that for the document preparer job, there existed 94, 460 positions nationally. (Tr. 24, 106-109). For the call out operator job, there were 123,700 positions nationwide. *Id*. Finally, for the food and beverage order clerk job, there were 104,083 positions nationally. *Id*.
    This incidence of work constitutes a significant number of jobs in the "national economy." 42 U.S.C. § 423(d)(2)(A); *Johnson v. Chater*, 108 F.3d 178, 181 (8th Cir. 1997) (200 jobs at state level and 10,000 nationally, constitute a significant number).

positions. *Id*. She exhibited decreased range of motion in her lumbar back, with tenderness, pain, and spasms. *Id*. She was able to straight leg raise to approximately 40 degrees on the right and 30 on the left. *Id*. She could stand on her own without assistance. *Id*.

An April 13, 2012, x-ray of the lumbar spine showed mild narrowing of the L5-S1 disc space, sclerosis of the endplates and facets, plus small osteophytes. (Tr. 300-301). The impression was spondylosis, mainly affecting L5-S1. *Id*.

On September 6, 2012, Pouncy was seen by Nicolas Batterton, M.D., for follow-up of 2D echocardiogram. (Tr. 295-296). At that time, she denied chest pains, shortness of breath, headaches, or vision changes. *Id*. She did not exercise because of low back pain. *Id*. However, her pain was well-controlled with Mobic. *Id*. She had seen a physical therapist, but was not doing her exercises. *Id*. She continued to smoke, and had no other complaints. *Id*. Batterton diagnosed hypertension, hyperlipidemia, depression, back pain, benign positional vertigo, syncope, and preventive measures. *Id*.

Pouncy was hospitalized from May 28-30, 2013, with chest pain and dizziness. (Tr. 311). She was stabilized and discharged. *Id*. A stress test was negative. *Id*. A May 28, 2013, chest x-ray showed no acute cardiopulmonary disease. (Tr. 349).

On May 29, 2014, Pouncy went to the emergency room with complaints of chronic back pain that radiated to her legs. (Tr. 356-361). Her symptoms were aggravated by movement, and alleviated by nothing. *Id*. At their worst, however, her symptoms were deemed moderate. *Id*. Pouncy demonstrated full range of motion in all joints, and had a normal gait. *Id*. Her back pain was mild. *Id*. She received a diagnosis for back pain with sciatica. *Id*.

On June 2, 2014, Pouncy was seen at Mental Health Solutions. (Tr. 475). She was diagnosed as bipolar, with ADHD, and assigned a Global Assessment of Functioning ("GAF")

score of 52-53. *Id*.[5]

Pouncy returned to Mental Health Solutions on July 1, 2014. (Tr. 474). Her diagnoses remained unchanged, and her GAF was 54-55. *Id*.

A July 15, 2014, office visit indicated that plaintiff's diabetes began in 2013. (Tr. 375-378). She described her pain as a 10/10. *Id*.

On August 23, 2014, Pouncy underwent a consultative physical examination administered by Justin Skweres, M.D. (Tr. 363-367). She complained of low back pain that had worsened over the past ten years. *Id*. The pain was intermittent, but severe, and radiated to her legs bilaterally. *Id*. Sometimes her legs would "give out" and become weak. *Id*. Her pain was exacerbated with walking or prolonged sitting, and alleviated by taking a warm bath. *Id*. She also endorsed intermittent vertigo that was unpredictable, but worsened with stress. *Id*. She was a half pack per day smoker for the past ten years. *Id*. She also endorsed depression/anxiety. *Id*. However, she was independent with her activities of daily living. *Id*.

Upon examination, Pouncy ambulated without assistance. *Id*. She exhibited a limited range of motion in the lumbar spine, with mild lumbar paraspinal tenderness to palpation. *Id*. She also had positive straight leg raise bilaterally. *Id*. Her gait/station was mildly abnormal. *Id*. She was able to rise from a seated position, without assistance, stand on her tiptoes, heels, and tandem walk without problems. *Id*. She had some difficulty bending and squatting, but could

---

[5] "GAF is a standard measurement of an individual's overall functioning level 'with respect only to psychological, social, and occupational functioning.'" *Boyd*, 239 F.3d at 701 n2 (citing AMERICAN PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 32 (4th ed. 1994) (DSM-IV)).
  A GAF of 51-60 is defined as "**[m]oderate symptoms** (e.g. flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, no friends, unable to keep a job). *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, DSM-IV, pg. 32.

perform the tasks without assistance. *Id*. She did not appear depressed or anxious. *Id*. X-rays showed severe disc space loss with associated endplate sclerosis at L5-S1, along with facet joint hypertrophy. *Id*.

Skweres diagnosed lower lumbar degenerative disc disease with radiculopathy; intermittent vertigo of unknown etiology, possibly benign; anxiety; depression; and diabetes. *Id*. He opined that Pouncy should be able to sit for a few hours, but would need breaks to move around to prevent back pain. *Id*. She would not be able to sit in one position, stand, or walk for a full workday. *Id*. She should not lift/carry objects over twenty pounds, and must avoid bending or squatting. *Id*. She could ambulate without assistance, but vertigo could limit her ability to perform some occupational tasks. *Id*. Her anxiety also might limit her ability to interact with others, but it did not affect her examination. *Id*.

On the same day as her consultative examination, Pouncy went to the emergency room with complaints of a fall injury. (Tr. 518-524). She fell while in the shower following a vertigo episode. *Id*. At their worst, however, her symptoms were moderate. *Id*.

On September 9, 2014, non-examining agency psychologist, Kelly Ray, Ph.D., reviewed the record, and completed a psychiatric review technique, indicating that plaintiff's mental impairments were not severe. (Tr. 119-120).

On September 11, 2014, non-examining agency physician, Timothy Honigman, M.D., reviewed the record and the consultative examination findings, and issued a physical residual functional capacity assessment. (Tr. 121-123). He indicated that Pouncy could lift and/or carry up to twenty pounds occasionally, and ten pounds frequently. *Id*. She could stand and/or walk for a total of four hours and sit for a total of six hours in an eight hour workday. *Id*. She occasionally could climb ramps/stairs, but never climb ladders/ropes, scaffolds. *Id*. She could

never stoop, but occasionally balance, kneel, crouch, and crawl. *Id*. She also had to avoid all exposure to hazardous machinery and heights. *Id*.

On September 12, 2014, plaintiff went to the emergency room in a wheelchair with complaints of back pain. (Tr. 512-517). Her dog had chased a cat and caused her to fall. *Id*.

On September 14, 2014, plaintiff returned to the emergency room with complaints of chronic back pain. (Tr. 499-505). A September 14, 2014, x-ray showed lumbar spondylosis. (Tr. 506-507).

Plaintiff saw nurse practitioner Tiffany George on December 5, 2014, for complaints of neuropathy, cold symptoms, and injury. (Tr. 396-401). Pouncy's onset of neuropathy was gradual, but severe. *Id*. She experienced constant bilateral foot and leg numbness, with an unsteady gait. *Id*. She had fallen in her home two days earlier. *Id*. She associated her injury with fatigue, and remarked that she frequently fell due to her legs giving out. *Id*.

On December 8, 2014, plaintiff presented to the emergency room in a wheelchair with complaints of chronic low back pain. (Tr. 491-498). She reported that her legs went out on her. *Id*. No musculoskeletal deficits were noted. *Id*.

Plaintiff was seen by an occupational therapist from December 17, 2014, to January 5, 2015. (Tr. 379-385). Upon discharge, she was able to dress herself, bathe with distant supervision, and groom herself. *Id*. She also could stand for up to three minutes, limited by her back pain. *Id*. The therapist noted that Pouncy had poor tolerance for therapy, and had made no progress. *Id*. Upon plaintiff's request, she was discharged from therapy. *Id*.

On or about December 17, 2014, a physical therapist observed plaintiff walking throughout her home with little or no difficulty, and no assistive device. (Tr. 464). Pouncy stated that she did not follow her diet because it was too hard to find appropriate food. *Id*. She

was drinking a Dr. Pepper during the visit. *Id*.

On December 20, 2014, plaintiff returned to the emergency room with complaints of acute and chronic back pain. (Tr. 485-490). She reported that she missed a step on the attic ladder. *Id*. At their worst, however, her symptoms were moderate. *Id*. She was diagnosed with low back strain, a possible fracture, and a herniated disc. *Id*.

On January 3, 2015, Pouncy went to the emergency room with complaints of chronic back pain and dizziness. (Tr. 480-484 ). Her friend explained that the PT and OT had overworked her that day. *Id*. She ambulated without assistance. *Id*. She described her pain as sharp, shooting, and that it began that afternoon. *Id*.

A January 19, 2015, office visit noted that plaintiff did not indicate a potential for falling. (Tr. 391-395). Moreover, she did not use or need assistance with activities of daily living. *Id*. Nonetheless, she described her pain as a 9/10. *Id*.

At the request of the ALJ/state agency, plaintiff underwent a psychological consultative examination on September 15, 2015, administered by Thomas Staats, Ph.D. (Tr. 530-534). Pouncy's report/presentation was considered reliable. *Id*. She stated that she was unable to work because of severe diabetic neuropathy in her legs that had an intensity of 9/10. She also had a 9/10 pain in her back and down both legs due to sciatica from degenerative disc disease and degenerative joint disease. *Id*. However, her gait was normal. *Id*. She reported bipolar disorder with breakthrough angry and depressive mood swings, plus ADHD. *Id*. Nonetheless, she passed all attention and concentration items without difficulty. *Id*. She also reported spells of vertigo of unknown etiology, accompanied by nausea. *Id*.

Pouncy stated that she first suffered PTSD symptoms when she was abandoned at the age of eight. *Id*. She complained of chronic anxiety and worry, demonstrated restlessness, muscle

11

tension, intrusiveness, and pain behaviors. *Id*. She suffered rom a pain disorder with severe somatic fixation. *Id*. She denied being a danger to herself or others, but reported episodic passive suicidal ideation. *Id*. Overall her attention and concentration were normal. *Id*. Her mental persistence was reported to be poor, but appeared adequate upon observation. *Id*. Her pace was fair. *Id*. Adaptation was poor, and working speed marginal. *Id*. She maintained only 15 percent of household chores. *Id*. She reported a history of excessive absenteeism. *Id*. She also reported poor stress tolerance, but normal ability to adapt to change. *Id*. She had marginal acceptance of instruction/feedback. *Id*.

Staats diagnosed moderate bipolar disorder type I; unspecified anxiety disorder with partial PTSD symptoms, and a severe somatic symptom disorder. *Id*. He opined that the claimant likely would be unable to tolerate the stress and pressure associated with the typical eight-hour work setting's activities and demands. *Id*. Her ability to maintain reliable attendance was questionable. *Id*. There was a high likelihood that she would show problematic behaviors in a work setting in the form of mood swings, absenteeism, anxiety, anger, memory problems, pain behavior, chronic fatigue, need for reminders and redirection, poor stress tolerance, depression, dizziness, and spells of vertigo. *Id*.

Staats completed a medical source statement of ability to do work-related activities (mental). (Tr. 527-529). He indicated that Pouncy had marked limitations in her ability to understand, remember and carry out complex instructions. *Id*. She had normal intelligence, judgment, and immediate memory. *Id*. He noted that she was diagnosed with ADHD, but was taking no medication for it and showed no problems with attention or concentration upon examination. *Id*. Her intermediate memory was weak. *Id*. He further noted mild limitations in her ability to interact with others. *Id*. However, her ability to respond appropriately to usual

work situations and to changes in a routine work setting was markedly limited. *Id*. Staats remarked that Pouncy had poor stress tolerance and suffered an unspecified anxiety disorder with partial PTSD features. *Id*. His opinion was based on observation, self-report, and a review of records. *Id*.

    b)    <u>Discussion</u>

Some time after the April 2015 hearing held before the ALJ in this matter, the ALJ/state agency apparently directed plaintiff to attend a psychological consultative examination with Dr. Staats. *See* Tr. 530. The Commissioner's Hearings, Appeals and Litigation Law Manual ("HALLEX") authorizes an ALJ to take this course of action when "the claimant does not provide adequate evidence about his or her impairment(s) for the ALJ to determine whether the claimant is disabled or blind, and the ALJ or the HO staff is unable to obtain adequate evidence from the claimant's medical source(s) . . . " (HALLEX § I-2-5-20 (2016)).

In other words, by directing plaintiff to attend a post-hearing consultative examination, the ALJ implicitly determined that the record on file was insufficient to determine whether the claimant was disabled. Nonetheless in his decision, the ALJ proceeded to partially discount not only Dr. Staats' opinion, but also that of the consultative physical examiner, Dr. Skweres. (Tr. 22-23).

It is axiomatic that the "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'" *Martinez v. Chater*, 64 F.3d 172, 175-76 (5th Cir.1995) (citation omitted). However, an ALJ cannot reject a medical opinion without an explanation supported by good cause. *See Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir.2000) (citations omitted).

The ALJ addressed the opinions of the consultative examiners, as follows,

13

> [w]hile Dr. Staats, a consultative psychological examiner, advised that the claimant had marked limitations in responding to usual work situations and changes in a routine work setting, this particular conclusion appears to be based on the claimant's subjective reports and is not corroborated by the other evidence of record. Dr. Staats did not include ADHD as a clinical impression and stated she showed no signs of this disorder. The undersigned accords this medical opinion partial weight as it appears to be driven by the claimant's subjective presentation/complaints, which are not entirely consistent with the longitudinal evidence of record. Additionally, the undersigned notes that Dr. Staats evaluated the claimant on only one occasion and did not have the benefit of a longitudinal treating relationship with the claimant. Dr. Staats' opinion is an overestimate of the severity of the individual's restrictions and limitations in this area of functioning and is based primarily on a snapshot of the individual's functioning. Dr. Staats' opinion regarding the capability to understand, remember, and carry out simple instructions, as well as the ability to make judgments on simple work-related decisions is entitled to substantial weight as it is consistent with the longitudinal evidence of record as well as the findings noted in the consultative examination.
>
> The undersigned has also considered the report of Dr. Skweres, a consultative physical examiner, that the claimant endorsed depression and anxiety which may limit her ability to interact with others. As stated above, Dr. Skweres noted normal mental status exam and specifically stated that the claimant did not appear depressed or anxious. Other examinations in the record document normal mood and affect. Therefore, the undersigned gives this opinion partial weight as it appears to rely primarily on the claimant's subjective complaints and is not consistent with the claimant's mental health treatment records.
>
> Regarding the medical opinions of the DDS medical consultants, the undersigned accords them significant weight as their opinions are generally consistent with the other evidence of record.

(Tr. 22-23) (internal citations omitted).

In other words, the ALJ endeavored to discount a portion of Dr. Staats' opinion on the purported grounds that it was based on the claimant's subjective complaints, it was not supported by the longitudinal record, and because Dr. Staats did not diagnose ADHD.

However, the court does not discern where Dr. Staats' findings regarding plaintiff's ability to respond appropriately to usual work changes was premised upon a phantom ADHD

diagnosis. Furthermore, while the ALJ's two remaining reasons for partially rejecting the ALJ's findings are potentially valid, the ALJ did not identify any substantial evidence in the "longitudinal" record that would support a finding that plaintiff's ability to respond appropriately to usual work situations, e.g., her ability to handle stress, was no more than mildly impaired. In fact, the ALJ acknowledged in his decision that none of the claimant's treating physicians had opined on the functional limitations of her impairments. (Tr. 22).[6]

In her brief, the Commissioner emphasized that plaintiff admitted at the hearing that her anxiety and depression were under better control with her new medication. (Tr. 89-91). Prior to the medication change, however, plaintiff was having sleep issues, plus panic and anxiety attacks at least three times per week. *Id*. Therefore, the fact that these symptoms were better controlled with a new medication regime does not serve to establish that plaintiff's mental impairments did not limit her ability to respond appropriately to usual work settings.

Insofar as the ALJ purported to credit the opinion of the non-examining agency psychologist, Kelly Ray, over that of the consultative psychologist, he was not at liberty to do so. A non-examining physician/psychologist's opinion does not provide good cause for an ALJ to discount the findings of an examining physician. *See Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988) (addressing ALJ's reliance upon non-examining physician's opinion to discount findings of treating physician).[7] Moreover, there is no indication that plaintiff's mental health

---

[6] Kenneth G. Stephens, M.D., assigned GAF scores that reflected moderate impairment. (Tr. 474-475). However, he did not consider the effects of plaintiff's mental impairments on a function by function basis.

[7] The Fifth Circuit cited *Lamb* for the proposition that the reports of non-examining physicians do not provide substantial evidence when the non-examining physician's medical conclusions "contradict or are unsupported by findings made by an examining physician." *Villa*

15

treatment records were in the file at the time that Dr. Ray reviewed the matter. *See e.g.*, Tr. 469 (records transmitted on May 19, 2015).

In short, the court finds that the ALJ did not provide good cause for partially rejecting Dr. Staats' findings. The ALJ cannot simply "pick and choose" those portions of the psychologist's findings that support his decision and discard the remainder. *Loza, supra*. Moreover, even if the ALJ *had* provided good cause for rejecting part of Dr. Staats' findings, the record otherwise does not support his implicit conclusion that plaintiff's mental impairments did not materially limit her ability to respond appropriately to usual work situations.

The court emphasizes that the ALJ need not necessarily derive his RFC from a corroborating medical source statement, but there must be alternative record evidence to support his assessment. *See Ripley v. Chater*, 67 F.3d 552, 557-558 (5th Cir. 1995). In the absence of a viable medical source statement, the most common and definitive source of alternative evidence is the claimant's own testimony. Here, however, plaintiff's representations were not consistent with the ALJ's RFC. *See* Tr. 251 (she does not want to be around anyone and does not handle stress well). Accordingly, the court is constrained to find that the ALJ's RFC is not supported by substantial evidence. *See Williams v. Astrue*, 2009 WL 4716027 (5th Cir. Dec. 10, 2009) (unpubl.) ("an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions").[8]

---

*v. Sullivan,* 895 F.2d 1019,1024 (5th Cir. 1990) (citing, *Lamb, supra*; and *Strickland v. Harris*, 615 F.2d 1103, 1109-10 (5th Cir. 1980)).

[8] Although not directly raised by plaintiff, the court further observes that the ALJ's physical RFC also does not appear to be supported by substantial evidence. Again, the ALJ gave "significant" weight to the findings of the non-examining agency physician, Dr. Honigman, and appeared to premise his RFC on Honigman's opinion that plaintiff could sit for about six hours

## II. Steps Four, Five and Remand

Because the foundation for the ALJ's step four and alternative step five determinations were premised upon an RFC that is not supported by substantial evidence, the court further finds that the Commissioner's ultimate conclusion that plaintiff is not disabled, likewise is not supported by substantial evidence.

The courts enjoy the authority to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. 42 U.S.C. §405(g). When reversal is warranted, the matter is remanded with instructions to make an award only if the record enables the court to conclusively determine that the claimant is entitled to benefits. *See Ferguson v. Heckler*, 750 F.2d 503, 505 (5th Cir. 1985); *see also Rini v. Harris*, 615 F.2d 625, 627 (5th Cir.1980) (reversing and remanding with direction to enter judgment where the evidence was not substantial and the record clearly showed the claimant's right to benefits).

The instant record is not so disposed. Plaintiff's residual functional capacity assessment remains indeterminate. Upon remand, the parties may contact plaintiff's treating physicians and ask them to complete medical source statements. The Commissioner also may send plaintiff for a new consultative examination(s).[9]

---

in an eight hour workday. *See* Tr. 133-134. However, the consultative physician, Dr. Skweres, opined that the claimant "should be able to sit for a few hours but would need breaks to move around to prevent back pain." (Tr. 365). If plaintiff can only sit for a total of a "*few* hours," this suggests a number less than six hours. The parties should clarify this potential discrepancy upon remand.

[9] The court need not consider plaintiff's additional arguments. These issues may be addressed upon remand, as needed.

17

**Conclusion**

For the foregoing reasons,

IT IS RECOMMENDED that the Commissioner's decision be REVERSED and REMANDED pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings consistent herewith.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before a final ruling issues.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, this 9th day of August 2018.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE